2018 IL App (1st) 172279

Fourth Division
December 27, 2018

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| RICO INDUSTRIES, INC., | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff and Counterdefendant-Appellee, | ) ) ) | |
| v. | ) | No. 12 CH 35979 |
| | ) ) | The Honorable |
| TLC GROUP, INC., | ) | Margaret Ann Brennan, |
| | ) | Judge Presiding. |
| Defendant and Counterplaintiff-Appellant. | ) ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Reyes and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1        The instant appeal arises from an agreement between plaintiff, Rico Industries, Inc., and defendant, TLC Group, Inc., in which defendant was to be the exclusive sales representative of plaintiff's products sold to Walmart. Plaintiff later sought to terminate the agreement, which contained a provision providing that it was only terminable upon the mutual consent of the parties, so plaintiff filed a complaint for declaratory judgment seeking a declaration that the agreement was terminable at will because it was a contract of indefinite duration. In return, defendant filed a number of counterclaims, alleging that it had not been paid all of the commissions to which it was entitled. Initially, the trial court granted defendant's motion for

judgment on the pleadings pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)), finding that the clause requiring a mutual agreement to terminate the contract was enforceable. However, the trial court granted plaintiff's motion to certify the question for our review, and on appeal, we found that the contract was terminable at will because it was a contract of indefinite duration. *Rico Industries, Inc. v. TLC Group, Inc.*, 2014 IL App (1st) 131522, ¶ 35. Accordingly, we reversed the trial court's grant of judgment on the pleadings and remanded for further proceedings. After remand, defendant amended its counterclaims several times; the trial court dismissed the majority of the counts and granted summary judgment on the two that survived dismissal. On appeal, defendant challenges (1) the trial court's grant of summary judgment on two counts of defendant's second amended counterclaim, (2) the trial court's dismissal of six counts of its amended counterclaims, and (3) several of the trial court's evidentiary rulings. For the reasons that follow, we affirm.

¶ 2                                          BACKGROUND

¶ 3        On September 24, 2012, plaintiff filed a complaint for declaratory judgment, alleging that plaintiff was in the business of manufacturing and distributing gift and novelty products to retail markets and that, on December 17, 2007, plaintiff and defendant entered into a written sales commission agreement whereby defendant would serve as plaintiff's sales representative with respect to certain products in Walmart stores.[1] The complaint alleged that plaintiff desired to terminate the agreement but that the agreement contained a provision providing that the agreement was terminable only upon the written consent of both parties. Accordingly, in count I of the complaint, plaintiff sought a declaratory judgment that such a

_____

[1]The complaint was amended twice, most recently on January 7, 2013.

2

clause was unenforceable as against public policy and that the agreement was terminable at will. In count II of the complaint, plaintiff alleged that there was a dispute as to whether defendant was owed commissions for sales of certain products to Walmart, and plaintiff sought resolution of that dispute.[2]

¶ 4    Attached to the complaint was a copy of the agreement, the entirety of which comprised approximately two-thirds of a page. As relevant to the instant appeal, the agreement provided the following with respect to commissions:

> "When Products are sold to Wal-Mart (including store level purchases) or a purchase order is received by [plaintiff] from Wal-Mart, a commission is earned (Commission). Commissions shall be calculated by multiplying the flat rate of twelve per cent (12%) times the net sales. [Plaintiff] shall pay Commissions no later than the 20th of the month following the day the Commission was earned."

¶ 5    On January 16, 2013, defendant filed a motion to dismiss count I of the second amended complaint or, in the alternative, for judgment on the pleadings with respect to that count. On the same day, defendant filed an answer to count II of the second amended complaint and a five-count counterclaim, in which defendant raised claims for (1) an accounting; (2) breach of contract, based on plaintiff's alleged failure to pay commissions; (3) violation of the Arkansas sales representative statute (Arkansas Act) (Ark. Code Ann. § 4-70-301 *et seq.* (West 2012)); (4) in the alternative, violation of the Illinois Sales Representative Act (Illinois Act) (820 ILCS 120/0.01 *et seq.* (West 2012)); and (5) in the alternative, *quantum meruit*. All counts of the counterclaim were based on allegations that plaintiff had

---

[2]On appeal, neither count of the complaint is at issue; the only issues concern defendant's counterclaims.

failed to pay commissions after it sought to terminate the agreement and on allegations that plaintiff had underpaid defendant commissions owed on prior sales.

¶ 6    On April 4, 2013, the trial court granted defendant's motion for partial judgment on the pleadings, finding that the termination provision was not unenforceable as against public policy. Plaintiff requested the trial court to certify the question for interlocutory appeal, and on May 1, 2013, the trial court entered an order doing so. On June 6, 2013, we granted plaintiff's petition for leave to appeal, and on February 7, 2014, we found that the termination provision was unenforceable as against public policy and, accordingly, reversed the grant of defendant's motion for judgment on the pleadings and remanded the case to the trial court. *Rico Industries, Inc.*, 2014 IL App (1st) 131522, ¶¶ 35-36.

¶ 7    On April 2, 2014, plaintiff filed a motion to dismiss all counts of defendant's counterclaim pursuant to section 2-615 of the Code, and on July 17, 2014, the trial court granted the motion without prejudice. On August 14, 2014, defendant filed an amended counterclaim, and on September 25, 2014, plaintiff filed a motion to dismiss the amended counterclaim pursuant to section 2-615 of the Code. On March 17, 2015, the trial court granted the motion to dismiss and gave defendant leave to replead its counterclaim. On the same day, the trial court entered an order transferring the case from the chancery division to the law division because only contract claims for money damages remained.

¶ 8    On April 28, 2015, defendant filed its second amended counterclaim, in which it stated seven causes of action. Count I was for violation of the Arkansas Act (Ark. Code Ann. § 4-70-301 *et seq.* (West 2012)), alleging that defendant was an Arkansas corporation and that all in-person communications between the parties occurred in Arkansas and all meetings and orders with respect to Walmart occurred in Arkansas and claiming the parties were subject to

the Arkansas Act. Count I alleged that plaintiff used defendant's services until Walmart selected plaintiff as a "preferred vendor" in 2012, after which plaintiff "concluded that it no longer needed [defendant] to preserve and enhance its relationship with Wal-Mart" and thereafter tried to modify or, in the alternative, terminate the agreement between the parties. Count I alleged that plaintiff failed to pay defendant any commissions after September 2012 and also underpaid defendant for commissions it was owed between December 2007 and September 2012. Count I alleged that under the Arkansas Act, this conduct entitled defendant to treble damages, plus attorney fees and costs.

¶ 9        Count II was pleaded in the alternative and alleged violations of the Arkansas Act limited to the failure to pay commissions on purchase orders and sales dated prior to September 24, 2012.

¶ 10       Count III was pleaded in the alternative and was for violation of the Illinois Act (820 ILCS 120/0.01 *et seq.* (West 2012)). As with count I, count III alleged that plaintiff failed to pay commissions after September 2012, as well as underpaid commissions owed prior to that date. As with the Arkansas Act, defendant alleged that the Illinois Act entitled it to treble damages, plus attorney fees and costs.

¶ 11       Count IV, like count II, was pleaded in the alternative and alleged violations of the Illinois Act limited to the failure to pay commissions on purchase orders and sales dated prior to September 24, 2012.

¶ 12       Count V was pleaded in the alternative and was for promissory estoppel, alleging that defendant relied upon plaintiff's promises made in the agreement and that, in reliance on that agreement, defendant lost the business of other vendors that it had previously represented with respect to Walmart and the opportunity to represent those vendors to Walmart. Count V

sought commissions on all purchase orders issued by Walmart to plaintiff after September 24, 2012, for the purchase of goods and merchandise covered by the terms of the agreement.

¶ 13 Count VI was based on the procuring cause doctrine, and alleged that as of September 24, 2012, defendant had already begun putting together plans for Walmart's 2013 fall football program and had shown Walmart all of plaintiff's products for the 2013 April Major League Baseball (MLB) program. Count VI alleged that Walmart had "verbally committed to placing with [plaintiff] the purchase orders for said products for both programs," which count VI alleged were estimated to be in the range of $3 to $5 million. Count VI alleged that "[i]t was then and had been the practice and procedure of Wal-Mart" that once Walmart had committed to placing purchase orders for a program, Walmart would, in fact, place the purchase orders for that program. Count VI alleged that, "[b]ased on the timing and stage of the process, and the practice and procedure of Wal-Mart aforesaid, and the fact that [plaintiff] had been placed in the position of being a preferred vendor to Wal-Mart through [defendant's] efforts as aforesaid, there existed a reasonable degree of certainty that said purchase orders would be issued to and were issued to [plaintiff]." Count VI alleged that, as the procuring cause of the purchase orders, defendant was entitled to commissions on the orders.

¶ 14 Finally, count VII was pleaded in the alternative and was for *quantum meruit*. Count VII alleged that plaintiff had been unjustly enriched by receipt and enjoyment of defendant's services without payment of commissions to defendant.

¶ 15 On September 25, 2015, plaintiff filed a motion to dismiss defendant's second amended counterclaim pursuant to section 2-615 of the Code. Plaintiff argued that defendant failed to state a cause of action with respect to each count of its counterclaim. As a preliminary matter,

plaintiff claimed that defendant's counterclaim attempted to reinstate the agreement, when our earlier opinion had expressly found that the agreement was terminable at will. With respect to counts I and II, involving the Arkansas Act, plaintiff claimed that Illinois law should apply. With respect to counts III and IV, involving the Illinois Act, plaintiff claimed that the counterclaim did not allege conduct so egregious as to rise to the level of quasicriminal conduct, which is required to state a claim for treble damages. With respect to count V, for promissory estoppel, plaintiff claimed that such a cause of action was not available in the presence of an enforceable contract between the parties. With respect to count VI, for procuring cause, plaintiff claimed that such a cause of action was only available where the contract did not expressly provide for when commissions will be paid, which was not the case in the case at bar. Finally, with respect to count VII, for *quantum meruit*, plaintiff claimed that quasicontractual recovery was unavailable where the parties had an express contract governing the issue.

¶ 16    On January 8, 2016, the trial court entered an order dismissing counts I, II, III, V, and VII of defendant's second amended counterclaim for failure to state a cause of action. With respect to counts I and III, the counts seeking commissions after September 24, 2012, under the Arkansas Act and the Illinois Act, respectively, the trial court found that defendant could not state a cause of action because both prior trial court rulings and our appellate court opinion found that the agreement was justifiably terminated because the termination clause was against public policy. With respect to count II, concerning the Arkansas Act, the trial court found that Illinois, not Arkansas, law applied and that defendant's "backdoor attempt to undermine the First District Appellate Court's ruling is unpersuasive." The court found that when we determined that the agreement was properly terminated, we "ruled that the Contract

is to be governed under Illinois Law and the law of the case applies." With respect to counts V and VII, for promissory estoppel and *quantum meruit*, respectively, the trial court found that neither cause of action was available where there was an express contract between the parties concerning the same subject matter.

¶ 17    The trial court, however, denied the motion to dismiss with respect to counts IV and VI. With respect to count IV, concerning violation of the Illinois Act for unpaid commissions prior to the termination of the agreement, the trial court found that defendant's allegations that plaintiff intentionally and fraudulently failed to pay commissions owed to defendant within 13 days of termination were sufficient to state a cause of action at the pleading stage of the proceedings. Finally, with respect to count VI, concerning the procuring cause doctrine, the trial court found that the agreement was ambiguous as to whether commissions were limited to the term of the contract or could be earned after its termination. Accordingly, the trial court found that defendant had stated a cause of action with respect to that count.

¶ 18    On June 8, 2016, defendant filed a motion for leave to file an amendment to its second amended counterclaim, which was granted on June 27, 2016. The amendment to the second amended counterclaim added a count VIII for "procuring cause for commissions earned on reorders and replenishments by Wal-Mart after September 24, 2012," claiming that defendant was owed commissions for reorders and replenishments even after September 24, 2012, because it was the procuring cause of such orders.

¶ 19    On July 19, 2016, defendant filed a motion to compel plaintiff to provide certain documents in discovery concerning the sales of goods to Walmart. Defendant claimed that plaintiff had produced approximately 7000 pages of documents but that they were disorganized and only a fraction were responsive to the document requests. However,

8

defendant claimed that these documents showed that plaintiff could produce the information when it desired to, demonstrating that plaintiff was not unable to produce the rest of the documents as it claimed. Accordingly, defendant sought an order directing plaintiff to produce (1) its internal sales reports, commission statements, and records of purchase orders that it received from Walmart since December 17, 2007; (2) all documentation available to plaintiff from Walmart's electronic data system or otherwise concerning or relating to the purchase orders issued by Walmart to plaintiff from and after September 24, 2012, for the 2013 MLB program and the 2013 football program (which was also known as the "Back to School" program); and (3) its internal sales reports, commission statements, and records of purchase orders that it received from Walmart since September 24, 2012, that were for replenishments or reorders of products for which Walmart had issued purchase orders to plaintiff between December 17, 2007, and September 24, 2012, and for the 2013 MLB program and the 2013 Back to School football program.

¶ 20    On July 25, 2016, plaintiff filed a motion to dismiss defendant's amendment to its second amended counterclaim[3] pursuant to section 2-615 of the Code, claiming that defendant's new procuring cause count, which sought commissions on all reorders even where defendant had already received commissions on the initial order, was simply a repackaging of defendant's *quantum meruit* claim, which had previously been dismissed. Plaintiff also argued that the procuring cause doctrine had no applicability to the instant case, where the language of the agreement governed the payment of commissions.

---

[3]We note that the file-stamped copy of the amendment to the second amended counterclaim contained in the record on appeal bears the date of September 22, 2016. Plaintiff's motion to dismiss the amendment appears to have been based on the proposed amendment that was attached to defendant's motion for leave to file the amendment. However, the new procuring cause count of the proposed amendment is identical to the subsequently filed amendment.

¶ 21     On August 1, 2016, the trial court entered an order in which it ordered plaintiff "to produce any commission or sales reports in its possession responsive to [defendant's] requests to produce to date. [Plaintiff] is not obligated to create any reports not in its possession." On October 20, 2016, the trial court entered a case management order in which it ordered that plaintiff "shall file a certificate of compliance that it has fully complied with its obligations to produce documents by October 28, 2016."

¶ 22     On October 28, 2016, the trial court entered an order granting plaintiff's motion to dismiss defendant's amendment to its counterclaim. The trial court found that the amendment sought commissions for reorders of products that plaintiff had previously sold to Walmart and that defendant "had no involvement with these reorders, and cannot allege that it procured these specific sales." Accordingly, the trial court dismissed defendant's amendment to its second amended counterclaim with prejudice. On November 30, 2016, defendant filed a motion to reconsider the dismissal or, in the alternative, to give it leave to amend, which was denied by the trial court on January 18, 2017.

¶ 23     On March 29, 2017, plaintiff filed a motion for summary judgment on the two remaining counts of defendant's second amended counterclaim: count IV, concerning violations of the Illinois Act, and count VI, concerning the procuring cause doctrine. With respect to count IV for violation of the Illinois Act, plaintiff argued that it was entitled to summary judgment because the Illinois Act was not applicable because it was not intended to provide a remedy to a representative that was challenging the termination itself and when the representative was unable to identify a specific commission for which it was unpaid. Plaintiff further argued that, since defendant challenged plaintiff's right to terminate the agreement, it would have been impossible for plaintiff to pay whatever was owed within 13 days of termination and

that its declaratory judgment action insulated it from liability. Plaintiff also argued that defendant ratified whatever commissions were paid to it, as defendant had "complete and unfettered access" to plaintiff's sales reports at all times and received checks and e-mails specifically referencing the commission percentage it was being paid on certain sales.

¶ 24     With respect to count VI for procuring cause, plaintiff argued that it was entitled to summary judgment because informal discussions with Walmart, or even verbal commitments, did not obligate Walmart to purchase anything from plaintiff.

¶ 25     Attached to the motion for summary judgment were a number of excerpts from deposition transcripts. First, in his discovery deposition, Tony Caire, defendant's principal owner, testified that he was unaware that he had been underpaid until he received information in discovery from Walmart and that plaintiff had repeatedly refused his requests for information. Caire testified that he discovered defendant was being paid 4%, not 12%, on some sales and that he was unaware of this fact at the time; Caire denied that he had a separate arrangement with plaintiff in which defendant would accept 4% commissions on local, in-store sales as opposed to the 12% it received for corporate sales. However, he admitted that he recalled a number of conversations to that effect with plaintiff in 2010 and received several checks that indicated a 4% commission. Caire also testified that there were occasions where he asked plaintiff to send him sales reports but that plaintiff did not always send them. With respect to orders, Caire testified that he was entitled to commissions once Walmart "gave the okay that there was going to be an order," not when the purchase order was actually placed. Caire testified that Walmart would verbally commit to an order 9 to 12 months in advance so that the supplier could begin processing the product but would not send in a purchase order until 30 to 60 days prior to the shipment date. With respect to damages,

Caire testified that he did not have the necessary information to compute the dollar amount of his damages. Caire testified that his employees had access to Walmart's Retail Link software, but that he did not, and the access was terminated "probably sometime in 2011 or late 2010."

¶ 26 Next, in an evidence deposition, Corbin Cauldwell testified that he worked for defendant from August 2007 until September 2011 as a category manager. He had access to Retail Link, which was a proprietary product from Walmart that permitted sales reports to be generated and had the ability to generate any reports that defendant requested concerning its relationship with Walmart. He did not recall Caire ever asking him to run Retail Link reports in order to confirm sales and determine what the commissions should be. Cauldwell testified that he had Retail Link access until the time he left defendant's employment, at which point his replacement took over. Cauldwell testified that he worked closely with Daniel Schack from plaintiff in order to put corporate sales programs together and following up to determine how plaintiff's product was performing in the stores. Cauldwell further testified that a vendor like plaintiff could obtain orders both from the corporate side, using a representative like defendant, and through local, in-store representatives. If a local representative was used, that representative would be entitled to a commission. Cauldwell recalled there being an issue where defendant also wanted to be paid commissions on the local representatives' sales but could not recall how that issue was resolved.

¶ 27 One of the exhibits to Cauldwell's deposition was a supplier agreement between Walmart and plaintiff. The supplier agreement defined "Order" as "any written or electronic purchase order for Merchandise issued by Company through an Authorized Buyer." Paragraph 2 of the supplier agreement concerned orders and provided, in relevant part:

12

"Projections, past purchasing history and representations about quantities to be purchased are not binding, and Company shall not be liable for any act or expenditure (including but not limited to expenditures for equipment, labor, materials, packaging or capital expenditures) by Supplier in reliance on them. Company may cancel all or any part of an Order at any time prior to shipment."

Paragraph 34 of the supplier agreement was entitled "No Business Expectation" and provided:

"Company has no obligation and makes no promises to purchase any minimum amount of Merchandise from Supplier. No person has authority, on Company's behalf, to make any representations or promises to Supplier of any expected or possible level of business with Supplier or about Company's intentions or expectations regarding any present or future business with Supplier. Company will never assume that Supplier will be willing to continue to deliver Merchandise under this Agreement or to accept any specific volume of Orders. Conversely, Supplier should never assume that Company will issue Orders for specific volumes, if any, of Merchandise, even if Supplier's impression is based on discussions Supplier may have had with Company representatives. No Company representative has authority to order Merchandise except an Authorized Buyer through an Order issued pursuant to and subject to the terms of this Agreement."

¶ 28     In his evidence deposition, Scott Malm testified that he worked for defendant from mid-August 2011 until January 2012 and worked as Cauldwell's "right-hand man." Malm had access to Retail Link for the entire time he was employed by defendant and would regularly generate reports, including sales numbers.

¶ 29 In his discovery deposition, Daniel Schack, vice president of sales for plaintiff, testified that "various people" at defendant had access to Retail Link and that even Caire sent him a Retail Link report on one occasion. Additionally, in an affidavit, Schack swore to the accuracy of a number of e-mail communications between plaintiff and defendant in which sales data was shared.

¶ 30 In his evidence deposition, Bryan Ford testified that he worked for defendant from November 2011 through December 2012 and had worked at Walmart for 10 to 11 years prior thereto. Ford testified that, while working at Walmart, it was his understanding that Walmart did not have any obligation to purchase goods from a supplier in the absence of an active purchase order. For defendant, Ford was a category analyst, working to build relationships with the buyers for all of the suppliers that defendant managed. Ford testified that Walmart revoked defendant's Retail Link access in early 2012 and that Walmart indicated that it was considering terminating its relationship with defendant and consolidating its sports licensing business under one management group. Ford testified that, when working with plaintiff, defendant would be paid a 12% commission for corporate sales. If plaintiff used a local representative, separate from defendant, plaintiff would pay the local representative a similar commission. Ford testified that it would not make "financial sense" for plaintiff to pay both the local representative and defendant the same commission on the same sale since plaintiff would not have the margins to support such payments and defendant did not have anything to do with such sales. Ford recalled there being an issue between plaintiff and defendant in which Caire wanted to be paid for sales made by local representatives, and plaintiff agreed to pay "something" for those sales; he could not recall the precise number but, when informed it was 4%, testified that "being able to afford to pay somebody else an additional four percent

for something that they weren't even a part of I think is very generous because I would have offered them zero." Ford testified that it was "really easy to calculate what your commission should be" because defendant's business was seasonal and involved only one or two purchase orders per season. Ford testified that Walmart would make verbal or written commitments several months in advance but could change its mind and not place its order, in which case the supplier was left with the inventory. Ford testified that plaintiff sent defendant checks once a week and that the checks would be placed on Caire's desk until Caire deposited them. Ford testified that sometimes Caire would contact plaintiff and ask to be paid commissions in advance of the purchase orders coming in.

¶ 31    Finally, in her evidence deposition, Shelley Tabor testified that she worked for Walmart as a buyer from 1995 until 2009, after which she briefly consulted for defendant with respect to its dealings with Walmart. Tabor testified that when she worked at Walmart, it was the normal course of dealing and was included as a term in supplier agreements that Walmart had no obligation to purchase a product until a purchase order was actually placed.

¶ 32    On April 24, 2017, defendant filed a motion to deem certain facts admitted by plaintiff. Defendant claimed that, in its requests to admit, it had requested that plaintiff admit the accuracy of a "paid history report" produced by Walmart in response to a subpoena issued to Walmart by defendant, as well as the accuracy of a document providing the "invoice date, invoice number, amount paid, item number and department number" of all of plaintiff's sales to Walmart between January 1, 2007, through February 4, 2013. Plaintiff's response to both requests was that it could not admit or deny either of them because the documents were not attached. Defendant claimed that, because these documents had been previously produced, they were not required to be attached to the requests to admit and plaintiff therefore should

be deemed to have admitted the accuracy of the documents. Defendant further claimed that plaintiff had its own records and could compare them with the documents produced by Walmart to confirm their accuracy.

¶ 33    In response, plaintiff argued that the documents were prepared by Walmart and that plaintiff was not in a position to authenticate documents that it had not prepared. Plaintiff further claimed that it had raised its objections in 2014, and defendant never filed a motion to compel or sought to have the issue decided by the court until three years later. On May 1, 2017, the trial court denied defendant's motion to deem the facts admitted.

¶ 34    On June 12, 2017, defendant filed a response to the motion for summary judgment, arguing that the Illinois Act was applicable. Defendant further argued that it never agreed to accept a 4% commission on direct-store sales and that Caire had no way of knowing that plaintiff was underpaying defendant. Defendant also argued that it was not required to allege in its complaint the specific amount of its damages and was only required to prove the amount once at trial. Finally, defendant argued that it was the procuring cause of the 2013 MLB and football programs and that plaintiff had not produced any evidence of any other procuring cause.

¶ 35    On the same day, defendant filed the affidavit of Caire,[4] in which he averred that Retail Link was a proprietary program created by Walmart and that defendant never had a Retail Link ID or password. Caire averred that Cauldwell, who worked at defendant's offices, was a category manager for Walmart, which gave him access to Retail Link. With respect to commission checks, Caire averred that defendant received checks from plaintiff on a weekly

_____

[4]This affidavit does not appear to have been attached to defendant's response to the motion for summary judgment. A different affidavit from Caire was attached to the response, attesting to the accuracy of the documents attached to the response.

basis, but the checks were rarely connected with a specific purchase order and plaintiff did not provide commission reports with the checks. Caire averred that many of the checks were for periodic payments that were connected to Walmart's commitments to plaintiff to purchase items in the future or were for balances owed to defendant as a result of purchase orders generating commissions that were in excess of the amounts previously paid. Caire averred that plaintiff considered commitments by Walmart to purchase products in the future to be the equivalent of products being "sold" to Walmart and paid commissions on those sales. Caire averred that he was unaware that he was being paid less than 12% on certain orders and, on the "rare occasion" that he received a check indicating a 4% commission, he would call plaintiff and demand the discrepancy be corrected. Caire averred that he never agreed to modify the agreement to accept a lower commission on direct-store sales.

¶ 36    On July 10, 2017, plaintiff filed a motion to strike Caire's affidavit, as well as documents attached to defendant's response to the motion for summary judgment that were produced by Walmart. With respect to Caire's affidavit, plaintiff argued that the affidavit was based on matters not within Caire's personal knowledge or were supported by inadmissible documents or documents not previously produced. Plaintiff also argued that defendant's exhibit No. 1(b), a 5425-page document produced by Walmart,[5] was inadmissible because there was no evidentiary foundation. Plaintiff claimed that the only foundation was Caire's second affidavit, which was attached to the response to the motion for summary judgment and merely attested that the documents were "true and correct copies of documents including e-mails and other records produced to [defendant] during the course of this litigation in response to subpoenas, request to produce or the website of Wal-Mart." Plaintiff further

---

[5]This exhibit is not contained in the record on appeal.

claimed that these documents were "incomprehensible as presented" and merely listed invoice numbers and amounts without referencing how any of the invoices pertained to defendant, what work defendant did to generate a commission on the invoices, what products were sold to generate the invoices, or include a copy of the invoices themselves. Plaintiff also sought to strike several other exhibits that had not been previously produced.

¶ 37     In response to the motion to strike, in addition to arguments that the challenged documents should not be stricken, defendant attached a "Certificate of Authenticity of Domestic Business Records Pursuant to Federal Rule of Evidence 902(11)" from Walmart, dated July 31, 2017, in which a senior paralegal averred that he was the custodian of records for Walmart, that the documents produced by Walmart were made at or near the time of the occurrence by a person with knowledge of those matters, that the records were kept in the course of a regularly conducted business activity of Walmart, and that the records were made by Walmart as a regular practice.

¶ 38     On August 15, 2017, parties came before the trial court for a hearing on the motion for summary judgment and the motion to strike. With respect to the motion to strike, the trial court found that Caire's affidavit did not comply with the requirements of Illinois Supreme Court Rule 191 (eff. Jan. 4, 2013) because much of the affidavit was based on matters not within his personal knowledge. The court also found with respect to the Illinois Act, that defendant had failed to establish the amount owed under the statute. The trial court entered an order granting summary judgment in plaintiff's favor on counts IV and VI of the second amended counterclaim. This appeal follows.

¶ 39                                     ANALYSIS

¶ 40         On appeal, defendant raises challenges to a number of the trial court's rulings: (1) that the trial court erred in granting summary judgment on counts IV and VI of the second amended counterclaim; (2) that the trial court erred in dismissing counts I, II, and III of the second amended counterclaim and count VIII of the amendment to the second amended counterclaim; and (3) that the trial court erred in several of its evidentiary rulings.

¶ 41         As an initial matter, we note that the parties make arguments about the sufficiency of defendant's brief on appeal and that defendant's brief was the subject of a motion to strike by plaintiff. We denied the motion to strike because plaintiff was able to file an adequate response to the brief and, as a result, was not prejudiced by its deficiency. However, we agree with plaintiff that defendant's brief contains serious deficiencies that hindered our review of the issues presented by defendant. For instance, defendant's statement of facts (which is unnumbered and not included in defendant's certification concerning the length of its brief) contains very few citations to the record on appeal, and the bulk of the statement of facts are taken from the affidavit of Caire, which was stricken by the trial court. Additionally, the statement of facts contains absolutely no information about (1) the procedural posture of the case; (2) the allegations contained in any of the pleadings, including the counts at issue on appeal; and (3) the trial court's rulings or reasoning on any issue before this court. Illinois Supreme Court Rule 341(h)(6) requires that an appellant's statement of facts "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6) (eff. Nov. 1, 2017). Supreme court rules are not advisory suggestions, but rules to be followed. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57; *In re Estate of*

*Michalak*, 404 Ill. App. 3d 75, 99 (2010). "Where an appellant's brief fails to comply with supreme court rules, this court has the inherent authority to dismiss the appeal." *Epstein v. Galuska*, 362 Ill. App. 3d 36, 42 (2005) (citing *In re Marriage of Gallagher*, 256 Ill. App. 3d 439, 442 (1993)). In the case at bar, we previously declined to strike defendant's brief because plaintiff was able to file an adequate response to it, and we do not revisit that decision here. However, the fact that we chose not to strike defendant's brief should in no way be taken by defendant as an indication that its brief was appropriate in light of the serious deficiencies contained within it.

¶ 42                              I. Motion for Summary Judgment

¶ 43        Turning, then, to the merits of defendant's appeal, we first consider the trial court's grant of summary judgment on counts IV and VI of the second amended counterclaim. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 44        "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102.

However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 45                                A. Evidentiary Rulings

¶ 46        Defendant first claims that the trial court erred in several of its evidentiary rulings related to the motion for summary judgment. Specifically, defendant challenges (1) the trial court's refusal to consider the report produced by Walmart, (2) the trial court's denial of defendant's motion to compel, (3) the trial court's denial of defendant's motion to deem facts admitted, and (4) the trial court's striking of Caire's affidavit.

¶ 47        First, defendant claims that the trial court erred in refusing to consider the report produced by Walmart because it was admissible as a certified business record. The determination that a record is admissible as a business record rests within the sound discretion of the trial court, and such a decision will not be reversed absent an abuse of that discretion. *Northbrook Bank & Trust Co. v. Abbas*, 2018 IL App (1st) 162972, ¶ 45. "An

abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or where there is an application of impermissible legal criteria." *Northbrook Bank & Trust*, 2018 IL App (1st) 162972, ¶ 45. In the case at bar, we cannot find that the trial court abused its discretion in finding a lack of foundation for admission of the report. To admit business records into evidence as an exception to the general rule excluding hearsay, the proponent must lay a proper foundation by demonstrating that the records were made (1) in the regular course of business, (2) at or near the time of the event or occurrence, and (3) that it was the regular course of business to maintain such a record. Ill. R. Evid. 803(6) (eff. Apr. 26, 2012); see also *Northbrook Bank & Trust*, 2018 IL App (1st) 162972, ¶ 47 (citing *Gulino v. Economy Fire & Casualty Co.*, 2012 IL App (1st) 102429, ¶ 27). Here, the trial court found that Caire was not able to lay a foundation for the report because he did not have any personal knowledge concerning the generation of the report. We cannot find this determination to be an abuse of discretion, especially since the bulk of Caire's representations before the trial court involved the claim that he had no knowledge of sales information.

¶ 48    Defendant also claims that the report was self-authenticating under Illinois Rule of Evidence 902(11) (eff. Jan. 1, 2011), because defendant provided a certification from Walmart's custodian of records. However, this certification was only provided in response to plaintiff's motion to strike the report and was dated July 31, 2017, over a month after defendant filed the report as an exhibit in response to the motion for summary judgment. We thus cannot find it was an abuse of discretion for the trial court to decline to consider the certification. We also note that the report itself is not contained in the record on appeal, so we have no way of reviewing the contents of the report, but plaintiff claims that the report is

incomprehensible without someone to explain it. Accordingly, we cannot find that the trial court abused its discretion in declining to consider it.

¶ 49    Similarly, we can find no error in the trial court's striking of Caire's affidavit. Under Illinois Supreme Court Rule 191, an affidavit submitted in connection with a motion for summary judgment

> "shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013).

"An affidavit submitted in the summary judgment context serves as a substitute for testimony at trial. [Citation.] Therefore, it is necessary that there be strict compliance with Rule 191(a) 'to insure that trial judges are presented with valid evidentiary facts upon which to base a decision.' " *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335-36 (2002) (quoting *Solon v. Godbole*, 163 Ill. App. 3d 845, 851 (1987)). In the case at bar, we agree with the trial court that Caire's affidavit did not satisfy the requirements of Rule 191. A great deal of the affidavit was based on matters not within his personal knowledge, such as his statements concerning the Retail Link system and statements concerning plaintiff's interpretation of when a product was "sold." Similarly, many of the documents on which Caire's affidavit relied were documents such as internet printouts or plaintiff's internal e-mails on which Caire was not included and not based on his personal knowledge. Accordingly, we cannot find that the trial court erred in striking his affidavit.

¶ 50    Finally, we cannot find that the trial court erred in denying defendant's motion to compel or motion to deem facts admitted. "Trial courts are vested with wide discretion in ruling on discovery matters, and a reviewing court will not disturb a trial court's discovery rulings absent an abuse of that discretion." *Bankers Life & Casualty Co. v. American Senior Benefits LLC*, 2017 IL App (1st) 160687, ¶ 29. In the case at bar, defendant filed a motion to compel plaintiff to plaintiff to produce (1) its internal sales reports, commission statements, and records of purchase orders that it received from Walmart since December 17, 2007; (2) all documentation available to plaintiff from Walmart's electronic data system or otherwise concerning or relating to the purchase orders issued by Walmart to plaintiff from and after September 24, 2012, for the 2013 MLB program and the 2013 Back to School football program; and (3) its internal sales reports, commission statements, and records of purchase orders that it received from Walmart since September 24, 2012, that were for replenishments or reorders of products for which Walmart had issued purchase orders to plaintiff between December 17, 2007, and September 24, 2012, and for the 2013 MLB program and the 2013 Back to School football program. The trial court entered two orders in response to this motion. First, on August 1, 2016, the trial court entered an order in which it ordered plaintiff "to produce any commission or sales reports in its possession responsive to [defendant's] requests to produce to date. [Plaintiff] is not obligated to create any reports not in its possession." Second, on October 20, 2016, the trial court entered a case management order in which it ordered that plaintiff "shall file a certificate of compliance that it has fully complied with its obligations to produce documents by October 28, 2016."

¶ 51    There is no indication that plaintiff failed to comply with those requests. Defendant nevertheless claims that plaintiff did not produce all of the documents in its possession.

However, defendant provides no facts or evidence in support of this assertion other than its claim that plaintiff's position that no further records existed was "inconceivable." We also note that defendant did not file any additional motions or produce any facts showing that plaintiff's production in light of these court orders was incomplete. Accordingly, we cannot find any error in the trial court's resolution of the motion to compel.

¶ 52    Similarly, with respect to the motion to deem facts admitted, defendant claimed that, in its requests to admit, it had requested that plaintiff admit the accuracy of a "paid history report" produced by Walmart in response to a subpoena issued to Walmart by defendant, as well as the accuracy of a document providing the "invoice date, invoice number, amount paid, item number and department number" of all of plaintiff's sales to Walmart between January 1, 2007, through February 4, 2013. The trial court denied defendant's motion on May 1, 2017. We cannot find that the trial court abused its discretion in doing so. As plaintiff noted before the trial court, plaintiff was not in a position to admit or deny the authenticity of the documents because they were prepared by Walmart, not by plaintiff. Additionally, as plaintiff noted, plaintiff raised its objections in 2014, and defendant took no further action until 2017. Accordingly, we cannot find that the trial court abused its discretion in denying the motion to deem facts admitted.

¶ 53                                B. Count IV

¶ 54    Turning to the merits of the trial court's summary judgment rulings, defendant first argues that the trial court erred in granting summary judgment on count IV, concerning violation of the Illinois Act, on the basis that defendant was unable to prove its damages. Under the Illinois Act:

25

"All commissions due at the time of termination of a contract between a sales representative and principal shall be paid within 13 days of termination, and commissions that become due after termination shall be paid within 13 days of the date on which such commissions become due. Any provision in any contract between a sales representative and principal purporting to waive any of the provisions of this Act shall be void." 820 ILCS 120/2 (West 2012).

¶ 55    Further, under section 3 of the Illinois Act:

"A principal who fails to comply with the provisions of Section 2 concerning timely payment or with any contractual provision concerning timely payment of commissions due upon the termination of the contract with the sales representative, shall be liable in a civil action for exemplary damages in an amount which does not exceed 3 times the amount of the commissions owed to the sales representative. Additionally, such principal shall pay the sales representative's reasonable attorney fees and court costs." 820 ILCS 120/3 (West 2012).

¶ 56    In the case at bar, the trial court found that summary judgment was appropriate because defendant could not establish the amount of its damages. "A plaintiff must prove damages to a reasonable degree of certainty, and evidence cannot be remote, speculative, or uncertain." *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 383 (2004). The party seeking damages bears the burden to establish not only that it has sustained damages but also a reasonable basis, or formula, for computation of those damages. *Kay v. Prolix Packaging, Inc.*, 2013 IL App (1st) 112455, ¶ 33. In his deposition, Caire testified that he was unable to compute the amount of damages owed due to incomplete information; however, even in its response to the motion for summary judgment, defendant still did not include any calculation

of damages or formula to be used in computation of those damages other than asserting that it would be able to prove them at trial. Defendant claims that the report provided by Walmart would have shown the amount of damages, but, as discussed above, that report was properly stricken by the trial court and cannot be used as a basis for damages under those circumstances. Furthermore, there is no indication that such a document would have provided the information necessary, as it apparently included only invoice numbers with no way of tying the invoices to sales made by defendant. Defendant also claims that Caire would have been competent to testify to the amount of commissions due. However, defendant does not explain how Caire would be able to do so in the absence of the Walmart report. Accordingly, we cannot find that the trial court erred in granting summary judgment on count IV.

¶ 57                                    C. Count VI

¶ 58        Defendant also claims that the trial court erred in granting summary judgment on count VI of the second amended counterclaim, concerning the procuring cause doctrine. Defendant claimed that it was entitled to commissions on the 2013 MLB and Back to School fall football programs because it was the procuring cause of those sales. Under the doctrine of procuring cause, "a party may be entitled to commissions on sales made after the termination of a contract if that party procured the sales through its activities prior to termination." *Technical Representatives, Inc. v. Richardson-Merrell, Inc.*, 107 Ill. App. 3d 830, 833 (1982). The doctrine is "designed to protect a salesperson who, although no longer an agent or employee when the sale is made, has done everything necessary to effect the sale." *Solo Sales, Inc. v. North America OMCG, Inc.*, 299 Ill. App. 3d 850, 852 (1998). In employing the doctrine, courts "are attempting to remedy the harsh nature of 'at will' contracts." *Scheduling Corp. of America v. Massello*, 151 Ill. App. 3d 565, 570 (1987).

However, the procuring cause rule is a default rule and applies "only if the contract does not expressly provide when commissions will be paid." *Technical Representatives*, 107 Ill. App. 3d at 833.

¶ 59    In the case at bar, we agree with plaintiff that defendant's argument is not entirely clear. At times, defendant appears to be arguing that the verbal commitments made by Walmart constituted "sales" so as to entitle it to commissions. At others, defendant appears to argue that the "sales" occurred later but that its efforts prior to termination were sufficient to entitle it to commissions. As the procuring cause doctrine applies only to the latter situation, it is that situation we discuss.

¶ 60    Defendant claims that by the time of its termination, Walmart had committed to placing its orders for both programs and so there was nothing left to do other than fulfill the orders. However, the only support for these assertions is Caire's affidavit, which, as discussed above, was properly stricken. Multiple witnesses testified in their depositions that Walmart was not obligated to purchase any products until after a purchase order was placed. Furthermore, Ford testified in his deposition that while it was likely that defendant had done some work on the MLB program, it was unlikely that it would have begun working on the Back to School fall football program. "A plaintiff is not required to prove its case at the summary judgment stage. A plaintiff must, however, present some facts to support the elements of its claim," and show that a factual issue exists. *Technical Representatives*, 107 Ill. App. 3d at 833. In the case at bar, defendant has not presented any evidence as to what work it had performed on the two programs prior to its termination. Accordingly, we cannot find that the trial court erred in granting summary judgment on the procuring cause claim.

¶ 61                                II. Motions to Dismiss

¶ 62        Defendant also challenges the trial court's dismissal of counts I, II, and III of the second

amended counterclaim and count VIII of the amendment to the second amended

counterclaim. All of the counts were dismissed pursuant to section 2-615 of the Code. A

motion to dismiss under section 2-615 of the Code challenges the legal sufficiency of the

complaint by alleging defects on its face. *Young v. Bryco Arms*, 213 Ill. 2d 433, 440 (2004);

*Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003). The critical inquiry is whether the allegations

in the complaint are sufficient to state a cause of action upon which relief may be granted.

*Wakulich*, 203 Ill. 2d at 228. In making this determination, all well-pleaded facts in the

complaint and all reasonable inferences that may be drawn from those facts are taken as true.

*Young*, 213 Ill. 2d at 441. In addition, we construe the allegations in the complaint in the light

most favorable to the plaintiff. *Young*, 213 Ill. 2d at 441. We review *de novo* an order

granting a section 2-615 motion to dismiss. *Young*, 213 Ill. 2d at 440; *Wakulich*, 203 Ill. 2d at

228. As noted, *de novo* consideration means we perform the same analysis that a trial judge

would perform. *Khan*, 408 Ill. App. 3d at 578. Again, we may affirm on any basis appearing

in the record, whether or not the trial court relied on that basis or its reasoning was correct.

*Ray Dancer*, 230 Ill. App. 3d at 50.

¶ 63                                A. Counts I and II

¶ 64        Defendant claims that the trial court erred in dismissing counts I and II, which were based

on violations of the Arkansas Act, because Arkansas, not Illinois, law should apply to the

instant case. A choice-of-law determination is required only when a difference in law will

make a difference in the outcome. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 155

(2007). In the case at bar, the difference between the Illinois Act and the Arkansas Act

concerns the availability of treble damages. As discussed above, the Illinois Act permits the imposition of treble damages for violations. 820 ILCS 120/3 (West 2012). However, Illinois courts have found that treble damages are not automatic under the Illinois Act but instead are left to the trial court's discretion. See, *e.g.*, *Installco Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 784 (2002); *Maher & Associates, Inc. v. Quality Cabinets*, 267 Ill. App. 3d 69, 80 (1994). By contrast, the Arkansas Act does not appear to vest the trial court with any discretion on the matter, providing that a principal who violates the Arkansas Act "is liable to the sales representative in a civil action for three (3) times the damages sustained by the sales representative, plus reasonable attorney's fees and costs." Ark. Code Ann. § 4-70-306 (West 2012). Thus, we must determine which law applies.

¶ 65    "Subject to constitutional limitations, the forum court applies the choice-of-law rules of its own state." *Townsend*, 227 Ill. 2d at 155. In contract cases, Illinois applies the "most significant contacts" test, set forth in the Restatement (Second) of Conflict of Laws. *Safeco Insurance Co. v. Jelen*, 381 Ill. App. 3d 576, 580 (2008). Under that test, the court looks to factors such as the place of contracting; the place of negotiations; the place of performance; the location of the subject matter of the contract; and the domicile, residence, nationality, place of incorporation, and place of business of the parties. Restatement (Second) of Conflict of Laws § 188 (1971). However, this test "is a guide for courts; it is not black-letter law to be upheld against all other considerations." *Maher*, 267 Ill. App. 3d at 77. "Illinois is among those States that generally follow the modern approach to choice-of-law questions, and this approach places the greatest importance on the public policy of the State in which a case is brought." *Maher*, 267 Ill. App. 3d at 77.

¶ 66    In the case at bar, the complaint alleges, and defendant does not dispute, that the contract was negotiated and entered into at plaintiff's offices in Illinois, that Caire traveled to Illinois to negotiate the contract, and that the contract was executed in Illinois. The contract did not include a clause that a particular state's law would apply. Additionally, our courts have found that the Illinois Act, which includes an anti-waiver clause, represents a "fundamental public policy" of the state. *Maher*, 267 Ill. App. 3d at 76; *English Co. v. Northwest Envirocon, Inc.*, 278 Ill. App. 3d 406, 410 (1996). While defendant may have been located in Arkansas and Walmart's corporate offices were located in Arkansas, we cannot find that these facts mean that the law of Arkansas should apply instead of the law of Illinois. Consequently, the trial court properly dismissed the two counts of the second amended counterclaim that were based on the Arkansas Act.

¶ 67                                  B. Count III

¶ 68    Defendant also challenges the trial court's dismissal of count III of its second amended counterclaim, which alleged that plaintiff violated the Illinois Act by failing to pay commissions on orders placed after the termination. Defendant claims that plaintiff was precluded from terminating the agreement under the doctrine of opportunistic advantage and, accordingly, defendant was entitled to commissions for orders placed after September 2012. A covenant of fair dealing and good faith is implied into every contract. *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Ass'n*, 97 Ill. App. 3d 22, 28 (1981); see also *J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 162 Ill. 2d 265, 278 (1994). Thus, a party is not permitted to engage in "opportunistic advantage-taking," or "lack of cooperation depriving the other contracting party of his reasonable expectations." *Hentze v. Unverfehrt*, 237 Ill. App. 3d 606, 611 (1992). In its brief, defendant claims that "the exercise by

31

[plaintiff] of its purported right to terminate the agreement, based solely upon a judicially created aversion to contracts for an indefinite term, was not only contrary to the reasonable expectation of the parties, it was directly contrary to their express written promise and in bad faith." However, " '[t]he duty of good faith and fair dealing does not override the clear right to terminate at will, since no obligation can be implied which would be inconsistent with and destructive of the unfettered right to terminate at will.' " *Mid-West Energy Consultants, Inc. v. Covenant Home, Inc.*, 352 Ill. App. 3d 160, 164 (2004) (quoting *Jespersen v. Minnesota Mining & Manufacturing Co.*, 288 Ill. App. 3d 889, 895 (1997), *aff'd*, 183 Ill. 2d 290 (1998)). Defendant identifies no "bad faith" conduct on the part of plaintiff other than its deciding that it no longer wished to use defendant's services and sought to enforce its right to terminate the contract. We thus cannot find that the trial court erred in dismissing count III of the second amended counterclaim.

¶ 69                                              C. Count VIII

¶ 70        Finally, defendant argues that the trial court erred in dismissing count VIII of the amendment to the second amended counterclaim, in which defendant claimed that it was entitled to commissions on reorders and replenishments after September 2012 pursuant to the procuring cause doctrine. The trial court dismissed this count because it found that defendant "had no involvement with these reorders, and cannot allege that it procured these specific sales." Defendant's only argument is that it is entitled to commissions because it was involved in the procurement of initial sales of the product. However, defendant provides no authority for the theory that it is entitled to commissions in perpetuity on new orders placed on the product after its termination simply because Walmart is purchasing something it had previously purchased. The procuring cause doctrine is intended for the situation in which a

salesman is discharged prior to the culmination of a sale but after he has done everything necessary to effect the sale. *Heuvelman v. Triplett Electrical Instrument Co.*, 23 Ill. App. 2d 231, 237 (1959). It is not intended to permit perpetual commissions where the salesperson has done nothing additional to effect the sale. We find the cases relied upon by defendant entirely distinguishable on this point, as they involved action on the part of the salesperson. Accordingly, we cannot find that the trial court erred in dismissing count VIII of the amendment to the second amended counterclaim.

¶ 71                                        CONCLUSION

¶ 72        For the reasons set forth above, we affirm the trial court's judgment in all respects.

¶ 73        Affirmed.